JUSTICE ALBIN delivered the opinion of the Court.
**338 Public confidence in the integrity of our municipal planning and zoning boards requires that board members be free of conflicting interests that have the capacity to compromise their judgments. The maintenance of public trust in municipal government is the focus of statutory ethical codes, guided by common law principles, that bar planning and zoning board members from hearing cases when a personal interest "might reasonably be expected to impair [their] objectivity or independence of judgment." N.J.S.A. 40A:9-22.5(d) ; see also N.J.S.A. 40:55D-69 ; N.J.S.A. 40:55D-23(b). That ethical commandment is at the heart of the appeal before us.
This case involves an application made by members of the Conte family for site plan approval and variances to construct a gas station, car wash, and quick lube on three lots in the City of Garfield. The issue raised is whether any members of the Garfield Zoning Board of Adjustment had a disqualifying conflict of interest because of the involvement of certain Conte family members in the Zoning Board proceedings.
Two of the three lots to be developed were co-owned by the irrevocable trusts of Dr. Kenneth S. Conte (Dr. Kenneth) and his brother, Dr. Daniel P. Conte, Jr. (Dr. Daniel). Dr. Daniel personally owned the third lot. A trust benefitting Dr. Kenneth's nephew -- Dr. Daniel P. Conte, III (Dr. Daniel III) -- and his two nieces **339 applied for development approvals. All three Contes practiced medicine in the adjacent medical building owned by Dr. Kenneth and Dr. Daniel.
Dr. Kenneth was a longtime member and the then-president of the Garfield Board of Education. The Board of Education approves, among other things, school employee appointments, contracts, and salaries. Five Zoning Board members were employed or had immediate family members employed by the Garfield Board of Education. To avoid the appearance of a conflict, the two lots owned by trusts bearing the names of Dr. Kenneth and his brother Dr. Daniel were transferred to the trust benefitting Dr. Kenneth's nieces and *187 nephew. Despite the intra-family transfer of property, Dr. Kenneth made his presence known at the Zoning Board hearing and made clear his position favoring the project.
Vincent Piscitelli and his daughter Rose Mary objected to the development project. They claimed that a conflict of interest barred Zoning Board members who were employed or had immediate family members employed by the Board of Education from hearing the application because Dr. Kenneth, as Board of Education president, voted on school-district personnel matters. The Piscitellis also contended that any Zoning Board members who were patients or who had immediate family members who were patients of Dr. Kenneth, Dr. Daniel, or Dr. Daniel III also had a disqualifying conflict of interest.
No Zoning Board member disqualified himself or herself on conflict-of-interest grounds. The Board granted site plan approval and the requested variances for the Conte project. The Piscitellis filed a complaint in lieu of prerogative writs in Superior Court to vacate the Zoning Board approvals, alleging that the Board members' disqualifying conflicts of interest undermined the legality of the proceedings. The trial court upheld the Zoning Board approvals, finding that no conflicts of interest had impaired the Board members. The court also denied the Piscitellis' request to inquire whether any Zoning Board members or their family members were patients of Dr. Kenneth, his brother, or his nephew.
**340 The Appellate Division affirmed.
We reverse and remand for further proceedings to decide whether any Zoning Board member had a disqualifying conflict of interest in hearing the application for site plan approval and variances in this case. The trial court must assess two separate bases for a potential conflict of interest. First, did Dr. Kenneth -- as president or a member of the Board of Education -- have the authority to vote on significant matters relating to the employment of Zoning Board members or their immediate family members? Second, did any Zoning Board members or an immediate family member have a meaningful patient-physician relationship with any of the three Conte doctors? If the answer to either of those questions is yes, then a conflict of interest mandated disqualification and the decision of the Zoning Board must be vacated. We do not possess sufficient information to answer those questions. We therefore reverse the judgment of the Appellate Division and remand to the trial court to determine whether any disqualifying conflicts impaired the Zoning Board proceedings. See N.J.S.A. 40A:9-22.5(d) ; N.J.S.A. 40:55D-69.
I.
A.
Dr. Kenneth S. Conte is a prominent citizen in the City of Garfield, where he has practiced medicine for many decades.[1] He has served since 1980 as a member of the Garfield Board of Education, including as vice president and president. The Board of Education governs the school district and makes important employment decisions concerning school personnel. Additionally, Dr. Kenneth's brother, Dr. Daniel P. Conte, Jr., served for many years as medical inspector of the school district, including during the Zoning Board hearing. Five members of the Zoning Board *188 **341 were employed or had immediate family members employed by the Board of Education.
The Kenneth S. Conte Irrevocable Trust II (Dr. Kenneth Trust) and the Dr. Daniel P. Conte, Jr. Irrevocable Trust I (Dr. Daniel Trust) owned two of three lots on Midland Avenue in Garfield, the site of a proposed gas station, car wash, and quick lube. Dr. Daniel owned the third lot personally with his wife, who was then deceased. Immediately adjacent to the proposed construction site is the Ken-Dan Medical Center owned by Dr. Kenneth and Dr. Daniel. There, the two brothers practice medicine along with Dr. Kenneth's nephew, Dr. Daniel P. Conte, III. Also adjacent to the construction site are other lots owned by Conte family members.
Dr. Kenneth's nephew and two nieces (Dr. Daniel's children) -- Dr. Daniel III, Stacey A. Conte, and Jamie G. Kreshpane -- are the trustees and beneficiaries of the DSJ Family Trust.[2] In March 2014, the DSJ Family Trust applied for site plan and variance approvals with the Garfield Zoning Board to construct a four-bay gas station, car wash, and quick lube on the three lots on Midland Avenue. At the time of the application, the DSJ Family Trust did not have an ownership interest in any of the three lots.[3]
Vincent and Rose Mary Piscitelli resided within 200 feet of the proposed construction site. They objected to the merits of the development. They also asserted that Zoning Board members who were employed or had immediate family members employed by the Board of Education should disqualify themselves on conflict-of-interest grounds. The Piscitellis argued that Dr. Kenneth, in his capacity as a Board of Education member and president, had the ability to influence the careers of Zoning Board members and their immediate family members employed in the school district.
**342 In an attempt to eliminate the conflict issue, Dr. Kenneth's nephew and nieces, acting as trustees of their uncle's trust, transferred the Dr. Kenneth Trust's fifty-percent interest in two of the three lots to the DSJ Family Trust for $ 420,500. On that same date, Karl Kreshpane, the then-trustee of the Dr. Daniel Trust, transferred for one dollar the remaining interest in those two lots to the DSJ Family Trust.[4] As a result of that transaction, Dr. Daniel and his three children, who controlled the DSJ Family Trust, owned the three lots subject to the development application.
At the Zoning Board hearing, attorney David Piscitelli represented his father Vincent, who objected on conflict-of-interest grounds, demanding that Zoning Board members disclose their relationship to the school district. Piscitelli was not persuaded that the transfer of property in Dr. Kenneth's trust to his nieces and nephew eliminated the conflict. Piscitelli argued that Dr. Kenneth's interest in the project was still evident from the intra-family property transfer and from Dr. Kenneth's co-ownership of the adjacent medical building with his brother Dr. Daniel, who retained his interest in one of the lots to be developed. The DSJ Family Trust responded that Dr. Kenneth had no remaining financial or *189 beneficial interest in the subject property and therefore no conflict barred a Zoning Board member from hearing the development application, regardless of whether a Board member or a family member was employed by the Board of Education. Piscitelli also objected on conflict grounds to Zoning Board members hearing the application if they or an immediate family member were patients of Dr. Kenneth, Dr. Daniel, or Dr. Daniel III.
Dr. Kenneth appeared at the first meeting, greeting some in attendance. In brief testimony before the Zoning Board, Dr. Kenneth challenged the Piscitellis' standing to object. Dr. Kenneth **343 testified that Vincent Piscitelli's wife had been his patient for thirty years and that he also had treated her daughters. Dr. Kenneth asserted that David Piscitelli's representation of his father -- and the Piscitellis' role in the proceedings -- "smells of a conflict." Dr. Kenneth and his brother Dr. Daniel attended all of the Zoning Board meetings. Dr. Daniel III sat at the applicants' table, except at one meeting when his father took his place.
At the second Zoning Board meeting, the Board's chairperson, Arlene Patire, disclosed that she worked for the Board of Education. Nonetheless, neither Patire nor any other Board member with an employment connection with the Board of Education disqualified himself or herself from hearing the development application. The Zoning Board attorney advised Board members that they did not have to disclose whether they had a patient-physician relationship with Dr. Kenneth, Dr. Daniel, or Dr. Daniel III, and none did. The merits of the development application were addressed through the expert testimony of a number of witnesses at the hearing.
At the third meeting, after the Board heard further expert testimony on the application, the chairperson opened the floor to comments from the public. In all, thirty-one members of the public spoke, twenty-two in favor of and nine opposed to the application. Many who offered comments about the construction of the gas station, car wash, and quick lube perceived the development project to be a Conte family undertaking. Here are some examples:
Antoinette Scaravelloni: "Who are the Contes? They're two very good doctors who have contributed to Garfield all their lives."
Joseph Cala: "[L]et's get to the business at hand. And that's the credibility of the Conte family."
Betty Ann Benigno: "I think it's a great idea that the Contes open up a car wash."
Rico Benigno: "The Contes are going [to] give us a beautiful car wash."
Donna LaPierre: "I feel that the Contes can spend their money anywhere."
Choudhary Manzoor: "[W]e should appreciate the Conte family bringing this kind of nice project in [the] City of Garfield."
**344 Richard Derrig: "The Conte family has a long, dedicated commitment to Garfield and they always will.... [T]hey decided to open a new family business within their community. I commend the Contes for that decision."
Joyce Nitti: "I can vouch for the Contes because I know them a long time. I know they're looking out for the community, they're very good people."
Paul Crochiola: "[W]e need a good car wash. And it's state of the art. I think the Contes should be approved for their project."
Anthony Barckett: "I support the Contes, yes. I believe what others have said is right, they're putting money back in the community."
*190 Charles Nucifora: "I think it's a great project. It's an entrepreneurial on the Contes part."
Rose Mary Piscitelli: "The Conte family doesn't have to build a car wash to clean up this lot.... They can build what is allowed by the zoning laws ... residential homes."
Four of the public members who gave testimony in favor of the project -- Derrig, Barckett, Nucifora, and Jeffrey Stewart -- served with Dr. Kenneth on the nine-member Board of Education in 2014. None apparently owned property within 200 feet of the construction site.
At the final meeting in August 2014, after hearing additional expert and public-member testimony, the Zoning Board voted seven to zero to grant preliminary and final site plan approval and a number of variances to develop the gas station, car wash, and quick lube. At the time, the Board of Education employed Zoning Board chairperson Arlene Patire and her husband, Board member Paul Houlis, and immediate family members of Board members Carmine Breonte, Salvatore Lamendola, and Robert Cochrane.[5] In October 2014, the Zoning Board issued a formal resolution granting the DSJ Family Trust site plan approval and variances.
B.
In December 2014, the Piscitellis filed a complaint in lieu of prerogative writs in the Superior Court, seeking to vacate the Zoning Board's resolution. The complaint named as defendants the **345 Garfield Zoning Board of Adjustment and Board members Patire and Cochrane (Zoning Board); Dr. Daniel Conte, Jr.; and the DSJ Family Trust and its trustees, including Dr. Daniel Conte, III. As grounds for relief, the Piscitellis pointed to deficiencies in the Board's grant of the land-use approvals and, separately, to alleged conflicts of interest impairing the impartiality of certain members of the Board. The Piscitellis asserted that a disqualifying conflict of interest applied (1) to any member of the Zoning Board who was employed or who had a family member employed by the Board of Education and (2) to any Zoning Board member who had been a patient of Dr. Kenneth, Dr. Daniel, or Dr. Daniel III, or whose family member had been a patient.
The prerogative-writs action revealed, through interrogatory responses, that the Garfield Board of Education employed Zoning Board members Patire and Houlis as well as the immediate family of Board members Patire, Breonte, Cochrane, and Lamendola. The trial court, however, struck interrogatory questions seeking the disclosure of whether Board members or their immediate family members were or had been patients of Dr. Kenneth, Dr. Daniel, or Dr. Daniel III. The court held that the inquiry into a patient-physician relationship was not relevant and thus exceeded the permissible scope of discovery. The court reasoned that those who serve on zoning boards of adjustment do not surrender their right to withhold medical information from public disclosure.
At the conclusion of a bench trial, the court dismissed the Piscitellis' prerogative-writs action. The court found that the Zoning Board's decision to grant site plan approval and variance relief for the gas station, car wash, and quick lube was not "arbitrary, capricious, or unreasonable." In its review of the record, the court made no distinction between Dr. Kenneth and Dr. Daniel and the trusts bearing their names.
*191 The court noted that when the development application was filed, the subject lots "were jointly owned by Dr. Kenneth S. Conte and his brother Dr. Daniel P. Conte, Jr."
The court rejected the Piscitellis' argument that Zoning Board members faced a disqualifying conflict of interest if either they or **346 their family were employed by the Board of Education. The court evidently gave great weight to the fact that, despite his position as Board of Education president, Dr. Kenneth was not the applicant and had no direct ownership interest in the property after its transfer to the DSJ Family Trust. The court determined it could not infer that Zoning Board members lacked impartiality merely because the Board of Education employed some Zoning Board members or their family.
C.
In an unpublished per curiam opinion, a three-judge Appellate Division panel affirmed the findings of the trial court, which upheld the Zoning Board's grant of site plan approval and variance relief.[6] The panel agreed with the trial judge "that the zoning board members were not disqualified from voting on the application." The panel acknowledged that Dr. Kenneth was a member of the Board of Education, which employed some of the Zoning Board members and their relatives. In the panel's view, however, there was no conflict because Dr. Kenneth's interest in the property, owned "through an individual trust in his name," was sold to the DSJ Family Trust after the filing of the development application. The panel observed that, although Dr. Kenneth's nieces and nephew were the beneficiaries and trustees of the DSJ Family Trust, Dr. Kenneth had no control over that trust. The panel concluded that "the connection between [the DSJ Family Trust] and the [Board of Education] was too attenuated to support a finding of a conflict of interest on the part of the zoning board members." The panel did not address whether Board members had a duty to disclose a patient-physician relationship with either Dr. Kenneth, Dr. Daniel, or Dr. Daniel III.
The Piscitellis petitioned for certification raising four issues. We granted the petition "limited to the issues related to the alleged **347 conflicts of interests of some members of the Zoning Board of Adjustment." 235 N.J. 392, 195 A.3d 1280 (2018). We also granted the motion of Libertarians for Transparent Government to participate as amicus curiae.
II.
A.
The Piscitellis contend that certain Zoning Board members were fatally tainted with conflicts of interest, despite the "eleventh hour transfer" of two lots from the Dr. Kenneth Trust and the Dr. Daniel Trust to a trust controlled by and benefitting Dr. Kenneth's nieces and nephew. The Piscitellis maintain that because the Board of Education employed Zoning Board members and their immediate family, that employment "might reasonably be expected to impair [their] objectivity or independence of judgment." See N.J.S.A. 40A:9-22.5(d). That is so, the Piscitellis reason, because Dr. Kenneth was the then-president of the Board of Education; his brother was the school district's longtime medical inspector; and four of the public members who testified in support of the *192 development project served with Dr. Kenneth on the Board of Education. According to the Piscitellis, Dr. Kenneth and his brother were the "de facto applicants," and the transfer of their trust property to their blood relatives did not alter the perception that the development application was a Conte family project. The Piscitellis argue that the Board members faced a potential conflict between their private interests and their public duties.
The Piscitellis also urge this Court to mandate that Zoning Board members disclose whether they or their immediate family members had a patient-physician relationship with Dr. Kenneth, Dr. Daniel, or Dr. Daniel III. They claim that the intimate relationship between a patient and a physician would impair the impartiality of a decisionmaker, and that privacy concerns must give way to ensure the integrity of public proceedings.
**348 Amicus Libertarians for Transparent Government echoes the Piscitellis' position that those Zoning Board members who were employed or had family members employed by the Board of Education "might feel influenced" to render a decision favorable to the positions advanced by Dr. Kenneth and his four colleagues on the Board of Education who testified in support of the development application. Amicus, moreover, rejects the notion that our conflict-of-interest laws can be circumvented by the transfer of an "ownership interest in property over to loyal relatives" after the filing of a development application. Confidence in the integrity of our government, amicus insists, requires that officials operate in an atmosphere where the public's interests and their personal interests are not in conflict.
B.
The Zoning Board argues that Dr. Kenneth's relationship to the development project and the Zoning Board members "is too attenuated to result in disqualification" based on a conflict of interest. The Zoning Board reaches that conclusion because Dr. Kenneth "sold the property to DSJ Family Trust, whose beneficiaries are his adult nieces and nephew," because "he retained no interest or control over the property," and because the development "application is entirely unrelated to the [Board of Education]."[7] It emphasizes that Dr. Kenneth "had no financial gain to be derived from the Application" and rejects the description of Dr. Kenneth as the "de facto Applicant." The Zoning Board dismisses any notion that, in voting for the development application, its members might have been influenced by their or their family's employment by the Board of Education. The Zoning Board considers as irrelevant that Dr. Kenneth served as president of the Board of Education and that he and four other members of the Board of Education testified in favor of the development project.
**349 The Board concludes that the Zoning Board members did not have a disqualifying conflict because they had nothing to gain for themselves or their families -- and therefore had no identifiable personal interest -- by voting for the application.
Last, the Board maintains that there is no disqualifying conflict of interest if a Board member had a patient-physician relationship with Dr. Kenneth, Dr. Daniel, or Dr. Daniel III. In its view, "a patient Board Member's hypothetical treatment with one of the Conte physicians would not reasonably be expected to impair his or her objectivity."
*193 The DSJ Family Trust aligns its arguments with those of the Zoning Board. DSJ concedes that at the time of the filing of the development application, two of the "lots were owned by trusts controlled by Doctor Kenneth Conte ... and Doctor Daniel Conte, Jr." and that "to avoid any perception of conflicts of interest," the titles to those lots were transferred to the DSJ Family Trust. DSJ asserts that, for conflict-of-interest purposes, any connection between the Zoning Board members and the Board of Education was too "remote or attenuated" because Dr. Kenneth and his brother were not the applicants. Last, DSJ asserts no conflict would arise if any of the Zoning Board members were patients of any of the three Conte doctors.
III.
The overall objective "of conflict of interest laws is to ensure that public officials provide disinterested service to their communities" and to "promote confidence in the integrity of governmental operations." Thompson v. City of Atlantic City, 190 N.J. 359, 364, 921 A.2d 427 (2007). Whether a disqualifying conflict of interest required the recusal of any member of the Garfield Zoning Board of Adjustment from hearing the development application is governed by three distinct sources of law: the Local Government Ethics Law, N.J.S.A. 40A:9-22.2 ; the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-69 ; and the common law, which is now codified in those conflict statutes and still guides us **350 in understanding their meaning. See Grabowsky v. Township of Montclair, 221 N.J. 536, 552, 115 A.3d 815 (2015).
Historically, under the common law, the judiciary exercised "comprehensive prerogative-writ jurisdiction" over "governmental tribunals, including administrative agencies." Wyzykowski v. Rizas, 132 N.J. 509, 522, 626 A.2d 406 (1993). Today, "[t]hat common-law jurisdiction is guaranteed under N.J. Constitution [A]rticle VI, [S]ection 5, [P]aragraph 4." Ibid. An essential guarantee of the common law is the right "to a fair and impartial tribunal." Ibid. That right is protected by common law conflict-of-interest rules now codified in the Local Government Ethics Law and the MLUL. Id. at 522-23, 626 A.2d 406 ; see also Paruszewski v. Township of Elsinboro, 154 N.J. 45, 58, 711 A.2d 273 (1998). Those rules continue to help guide our review of prerogative-writ challenges to "municipal action on conflict of interest grounds." Paruszewski, 154 N.J. at 58, 711 A.2d 273.
Our primary purpose is to construe the Local Government Ethics Law and the MLUL, guided by the common law, in determining whether any Zoning Board member was impaired by a conflict of interest. We review issues of law before a Zoning Board de novo, owing no deference to the interpretive conclusions of either the Zoning Board, the trial court, or the Appellate Division. Dunbar Homes, Inc. v. Zoning Bd. of Adjustment of Twp. of Franklin, 233 N.J. 546, 559, 187 A.3d 142 (2018).
The Local Government Ethics Law applies to all municipal office holders, including mayors; municipal councils; municipal attorneys; and, importantly for our purposes, members of planning boards and zoning boards of adjustment. See N.J.S.A. 40A:9-22.3(g)(2) (defining a "[l]ocal government officer" as "any person ... serving on a local government agency which has the authority to enact ordinances, approve development applications or grant zoning variances"). N.J.S.A. 40A:9-22.5(d) provides that
[n]o local government officer or employee shall act in his official capacity in any matter where he, a member of his immediate *194 family, or a business organization in which he has an interest, has a direct or indirect financial or personal involvement **351 that might reasonably be expected to impair his objectivity or independence of judgment.
In enacting this code of ethics for municipal officers and employees, the Legislature declared its intent by stating:
a. Public office and employment are a public trust;
b. The vitality and stability of representative democracy depend upon the public's confidence in the integrity of its elected and appointed representatives;
c. Whenever the public perceives a conflict between the private interests and the public duties of a government officer or employee, that confidence is imperiled[.]
[ N.J.S.A. 40A:9-22.2(a) to (c).]
We must construe N.J.S.A. 40A:9-22.5(d) to further the Legislature's expressed intent that "[w]henever the public perceives a conflict between the private interests and the public duties of a government officer," "the public's confidence in the integrity" of that officer is "imperiled." N.J.S.A. 40A:9-22.2(b) to (c) ; see also Grabowsky, 221 N.J. at 553, 115 A.3d 815. We also view the statutory language consonant with common law principles. The issue is whether Zoning Board members had an "interest" or "a direct or indirect financial or personal involvement that might reasonably be expected to impair [their] objectivity or independence of judgment." N.J.S.A. 40A:9-22.5(d). Viewed in that light, we must determine whether the Board of Education's employment of Zoning Board members, or the members of their immediate family, might reasonably have impaired a Zoning Board member's objectivity or independence, given the interest of Dr. Kenneth -- the Board of Education president -- in the outcome of the Zoning Board hearing. See Wyzykowski, 132 N.J. at 529, 626 A.2d 406.
The issue is whether the "private interests" of certain Zoning Board members -- their possible concerns over their employment and their families' employment in the school district -- clash with the exercise of their "public duties" -- the faithful and impartial review of a development application. See N.J.S.A. 40A:9-22.2. Clearly, if Zoning Board members had reason to consider their "private interests" in casting a vote, that alone could undermine public confidence in their impartiality.
**352 In addition to the general ethics code applicable to all municipal officers and employees are the constraints the MLUL places on members of zoning boards. N.J.S.A. 40:55D-69 provides that "[n]o member of the board of adjustment shall be permitted to act on any matter in which he has, either directly or indirectly, any personal or financial interest."[8] Read harmoniously with the Local Government Ethics Law and the common law, a Zoning Board member's personal and financial interest would be implicated if a vote might adversely or favorably impact his or her employment, or immediate family member's employment, in the school district.
*195 See N.J.S.A. 40:55D-69 ; N.J.S.A. 40A:9-22.5(d).
As noted earlier, common law conflict-of-interest principles inform our understanding of the Local Government Ethics Law and the MLUL. See Wyzykowski, 132 N.J. at 523-25, 626 A.2d 406. One of the common law bases for disqualification on conflict-of-interest grounds identified in Wyzykowski is an indirect personal interest. Id. at 525-26, 626 A.2d 406. An indirect personal interest is "when an official votes on a matter in which an individual's judgment may be affected," such as when the official may cast a vote at odds with the wishes of his private employer. See Grabowsky, 221 N.J. at 553, 115 A.3d 815 (quoting Wyzykowski, 132 N.J. at 525, 626 A.2d 406 ).
The overlapping conflict-of-interest codes that apply to this case can be distilled into a few common-sense principles. A citizen's right to "a fair and impartial tribunal" requires a public official to disqualify himself or herself whenever "the official has a **353 conflicting interest that may interfere with the impartial performance of his duties as a member of the public body." Id. at 551, 115 A.3d 815 (quoting Wyzykowski, 132 N.J. at 522-23, 626 A.2d 406 ). The question is not "whether a public official has acted dishonestly or has sought to further a personal or financial interest; the decisive factor is 'whether there is a potential for conflict.' " Id. at 554, 115 A.3d 815 (quoting Wyzykowski, 132 N.J. at 524, 626 A.2d 406 ). "The question will always be whether the circumstances could reasonably be interpreted to show that [conflicting interests] had the likely capacity to tempt the official to depart from his sworn public duty." Wyzykowski, 132 N.J. at 523, 626 A.2d 406 (quoting Van Itallie v. Borough of Franklin Lakes, 28 N.J. 258, 268, 146 A.2d 111 (1958) ).
A conflict of interest arises whenever a public official faces "contradictory desires tugging [him or her] in opposite directions." Id. at 524, 626 A.2d 406 (quoting LaRue v. Township of East Brunswick, 68 N.J. Super. 435, 448, 172 A.2d 691 (App. Div. 1961) ). This objective inquiry into whether a disqualifying conflict is present dispenses with any probing into an official's motive because the ultimate goal is to ensure not only impartial justice but also public confidence in the integrity of the proceedings. See Grabowsky, 221 N.J. at 554, 115 A.3d 815. Our conflict-of-interest rules, however, do not apply to "remote" or "speculative" conflicts because local governments cannot operate effectively if recusals occur based on ascribing to an official a conjured or imagined disqualifying interest. See ibid. (quoting Wyzykowski, 132 N.J. at 523, 626 A.2d 406 ). Requiring recusals when appropriate does not discourage public-spirited citizens from serving on boards. Dedicated public servants -- given proper guidance -- will not want to sit in judgment if they are encumbered by a potential conflict.
To be sure, "[a] court's determination 'whether a particular interest is sufficient to disqualify is necessarily a factual one and depends upon the circumstances of the particular case.' " Ibid.
**354 (quoting Van Itallie, 28 N.J. at 268, 146 A.2d 111 ). Given those basic principles, we turn to the facts of this case.
IV.
The overarching issue is whether Dr. Kenneth's association with and interest in the development application before the Garfield Zoning Board of Adjustment had the capacity to tempt certain Zoning Board members to consider their private interests at the expense of their public duties. Concern by a public official that a vote might have a negative impact on the *196 official's employment -- or a family member's employment -- might give reason to consult one's private interest. Five Zoning Board members were either employed or had immediate family members employed by the Garfield Board of Education at the time of the development application and hearing in this case. The chairperson and her husband were both employees in the school district.
In 2014, Dr. Kenneth had served thirty-four years as a member of the Board of Education and was the then-serving president of the nine-member Board. The Board of Education is the executive body that governs the school district and has the power to hire and dismiss "such principals, teachers, janitors and other officers and employees, as it shall determine, and fix and alter their compensation and the length of their terms of employment." N.J.S.A. 18A:16-1. It also has the authority to "[p]erform all acts and do all things ... necessary for the lawful and proper conduct, equipment and maintenance of the public schools of the district." N.J.S.A. 18A:11-1(d). As such, a Zoning Board member employed by the Board of Education might reasonably have had concern about courting disfavor with Dr. Kenneth, who was in a position to influence school-district personnel matters.
The record establishes Dr. Kenneth's interest in the development project. Dr. Kenneth's nieces and nephew were the trustees and beneficiaries of the DSJ Family Trust, which applied to the Zoning Board to construct a gas station, car wash, and quick lube on three lots on Midland Avenue in Garfield. The DSJ Family **355 Trust had no ownership interest in any of the lots at the time it filed the development application. Instead, Dr. Kenneth and his brother's irrevocable trusts owned two of the lots, and his brother owned the third lot. Dr. Kenneth and his brother, moreover, owned the adjacent Ken-Dan Medical Center, where they practiced medicine with Dr. Kenneth's nephew, Dr. Daniel III. Additionally, Conte family members owned other adjacent lots.
The Zoning Board and DSJ Family Trust claim that the sale of the two lots owned by Dr. Kenneth and his brother's trusts to the DSJ Family Trust removed any conflict of interest. Interestingly, the DSJ Family Trust's brief to this Court stated that the sold "lots were owned by trusts controlled by Doctor Kenneth Conte ... and Doctor Daniel Conte, Jr." and the Zoning Board's brief stated that "[Dr. Kenneth] sold the property to DSJ Family Trust." We need not speculate whether the trustees of Dr. Kenneth's irrevocable trust -- his nieces and nephew -- acted independently of direction from him. It merely bears mentioning that, at times, not even the Conte family or the Zoning Board makes a distinction between Dr. Kenneth and the trust bearing his name -- the two are referred to interchangeably.
Moreover, Dr. Kenneth's brother, Dr. Daniel, the school district's long-serving medical inspector, retained the third lot. Nor can we dismiss the fact that the two brothers owned the adjacent medical building. The interlocking Conte family interests were not hidden, but were in plain sight.
Dr. Kenneth left no doubt about his interest in the project to the Zoning Board. In his brief testimony to the Zoning Board, he attacked the Piscitellis' standing to object to the project. He attended all four Zoning Board meetings, and at the first meeting greeted some in attendance. Many of those public members who testified at the hearing considered the project a Conte family undertaking and did not distinguish among the Contes. Four of Dr. Kenneth's colleagues on the nine-member Board of Education testified in favor of the *197 gas station, car wash, and quick lube on Midland Avenue. With those four joining Dr. Kenneth, a majority **356 of the Board of Education had weighed in on the project -- a point, presumably, not lost on Zoning Board members who were employed or had immediate family members employed by the Board of Education.
We would have to put blinders on to ignore what must have been self-evident to those in attendance at the Zoning Board hearing: Dr. Kenneth's manifest interest in his family's project to develop the property on Midland Avenue -- property owned, in part, by a trust in his name when the development application was filed. In assessing an alleged conflict of interest, we are not required to bow to formalisms concerning title to property when intra-family deals do not obscure a true interest at stake. See Grabowsky, 221 N.J. at 554, 115 A.3d 815 (emphasizing that our conflict of interest analysis always "depends upon the circumstances of the particular case" (quoting Van Itallie, 28 N.J. at 268, 146 A.2d 111 ) ).
Under the Local Government Ethics Law, might the Zoning Board members' employment connections to the Board of Education "reasonably be expected to impair [their] objectivity or independence of judgment"? See N.J.S.A. 40A:9-22.5(d). Under the MLUL, given their employment connections to the Board of Education, did Zoning Board members have either a direct or indirect personal or financial interest in the outcome of the Conte family application? See N.J.S.A. 40:55D-69. In plainer terms, under the common law, the question is whether, reasonably viewed, conflicting interests "had the likely capacity to tempt [Zoning Board members] to depart from [their] sworn public duty," Wyzykowski, 132 N.J. at 523, 626 A.2d 406 (quoting Van Itallie, 28 N.J. at 268, 146 A.2d 111 ), or whether those Zoning Board members faced "contradictory desires tugging [them] in opposite directions," id. at 524, 626 A.2d 406 (quoting LaRue, 68 N.J. Super. at 448, 172 A.2d 691 ). In short, if any Zoning Board members had reason to believe that voting against the development application might be a bad career move for them or their family, a disqualifying conflict of interest would be present under **357 the Local Government Ethics Law and the MLUL as informed by the common law.
Illustrating this type of conflict is Wyzykowski, 132 N.J. 509, 626 A.2d 406. In Wyzykowski, the mayor of Neptune Township applied to the township's planning board to develop a previously vacant lot. Id. at 512, 626 A.2d 406. A planning board member owed his appointment to three paid positions in municipal government to the mayor. Id. at 516, 626 A.2d 406. We held that the planning board member should have disqualified himself from hearing a matter involving the mayor who assisted him in gaining the municipal government positions. Id. at 526, 626 A.2d 406. We recognized the very real prospect that the planning board member would face those "contradictory desires tug[ging] [him] in opposite directions" -- desires that pitted his personal interest against his public duties. See ibid. (quoting LaRue, 68 N.J. Super. at 448, 172 A.2d 691 ).
In the end, we must be mindful that "[w]henever the public perceives a conflict between the private interests and the public duties of a [Zoning Board member]," the "public's confidence in the integrity of its ... appointed representatives" is imperiled. See N.J.S.A. 40A:9-22.2(b) to (c). In deciding whether any member of the Zoning Board was impaired by a disqualifying conflict, we must eschew a mechanical approach that ignores the true circumstances faced by an officeholder whose impartiality may reasonably come *198 into question in the eyes of the public. In this case, no different from other conflict cases, the determination of whether a Zoning Board member possessed a personal interest sufficient to warrant disqualification is "a factual one and depends upon the circumstances of the particular case." See Grabowsky, 221 N.J. at 554, 115 A.3d 815 (quoting Van Itallie, 28 N.J. at 268, 146 A.2d 111 ).
We do not have a sufficient record before us to answer that question or the others posed earlier about the potential for a conflict in this case. The record does not disclose the precise statutory powers Dr. Kenneth exercised as a member or as **358 president of the Board of Education concerning the appointment of school personnel, the approval of their contracts, the setting or adjustment of their salaries, or other significant personnel decisions. Nor do we know whether Zoning Board members might have had reasons to apprehend that Dr. Kenneth would in the future vote on such matters -- matters that clearly would give rise to a personal interest and the potential for a disqualifying conflict. The minutes and resolutions of the Garfield Board of Education, including those related to Zoning Board members or members of their immediate family, and other sources of information may give insight on this subject.
Accordingly, we remand to the trial court to determine whether any Zoning Board member possessed a disqualifying conflict based on the principles enunciated above. If the court finds that any Zoning Board member participated in the proceedings while impaired by a disqualifying conflict, then it must declare that the Board's actions are a nullity and vacate the resolution granting site plan approval and variance relief to the DSJ Family Trust. See Randolph v. City of Brigantine Planning Bd., 405 N.J. Super. 215, 232-33, 963 A.2d 1224 (App. Div. 2009) (citing Haggerty v. Red Bank Borough Zoning Bd. of Adjustment, 385 N.J. Super. 501, 516-17, 897 A.2d 1094 (App. Div. 2006) ) (voiding and setting aside zoning board proceedings "in their entirety" because of an impermissible conflict of interest on the part of the board's chairwoman). In that event, the Zoning Board would be required to conduct new proceedings with conflict-free Board members.
V.
The trial court and Appellate Division determined that Zoning Board members did not have to disclose whether they or their immediate family members had been or currently were patients of Dr. Kenneth, Dr. Daniel, or Dr. Daniel III. We have recited in detail Dr. Kenneth's involvement in the development application. It bears emphasizing, however, that Dr. Daniel and Dr. Daniel III
**359 stood to directly financially benefit if site plan approval and variances were granted for the three lots on Midland Avenue. Dr. Daniel personally owned one of the lots. The DSJ Family Trust -- the project's applicant -- owned the other two lots, and Dr. Daniel III was both a trustee and beneficiary of that trust.
We hold that if a Zoning Board member or his or her immediate family member had a meaningful patient-physician relationship with any of those three doctors during or before the Board proceedings, that Board member had a disqualifying conflict of interest. We reach that conclusion because of the special nature of the patient-physician relationship -- a relationship in which the patient "reposes the greatest trust for health-care decisions" in the hands of the physician. Perez v. Wyeth Labs. Inc., 161 N.J. 1, 30, 734 A.2d 1245 (1999). Physicians are responsible for caring for and maintaining the physical and mental health of their patients *199 so that they can enjoy productive and happy lives. In that light, the deep bonds that develop between patients and their physicians are understandable.
Physicians every day diagnose and treat patients for the mild and malignant maladies that afflict the human body and mind. It would be natural for a patient to owe a debt of gratitude to a doctor who has removed a cancerous lesion from the skin, repaired a shoulder injury, replaced a knee, set a broken bone, performed heart or kidney surgery, delivered a child, prescribed life-enhancing or -saving medications, provided psychiatric therapy, or every year treated symptoms for the common cold or flu. It is not unusual for a physician to treat a family over the course of decades.
A person may have difficulty judging objectively or impartially a matter concerning someone to whom he would naturally feel indebted. By any measure, under the conflict-of-interest codes previously discussed, we cannot expect Zoning Board members to have a disinterested view of a doctor with whom they, or immediate members of their family, have had a meaningful patient-physician relationship.
**360 We cannot here fully limn the contours of what would constitute a meaningful patient-physician relationship because that may depend on the length of the relationship, the nature of the services rendered, and many other factors. The determination will be fact specific in each case. A few examples, however, should provide some guidance. On one end of the relationship spectrum may be the physician who, once five years ago, merely inoculated the patient with a flu shot, and on the other end may be the physician who, ten years ago, performed a life-saving heart transplant. A primary-care physician who examines a patient annually and tends to the patient's health-care issues as they arise or the surgeon who performs a life-altering or -enhancing procedure will fall within the sphere of a meaningful relationship that should prompt disqualification.
The potential disclosure of highly intimate and personal health-care information raises legitimate privacy concerns and therefore must be addressed with great sensitivity. "[O]ur courts have recognized that competing public policies may require disclosure of otherwise privileged information." Kinsella v. NYT Television, 382 N.J. Super. 102, 110, 887 A.2d 1144 (App. Div. 2005). "[D]isclosure is required only if the party seeking production makes a 'compelling' showing of a particularized need for the information." Id. at 111, 887 A.2d 1144 (citing McClain v. Coll. Hosp., 99 N.J. 346, 362-64, 492 A.2d 991 (1985) ). First, we must recognize that those who hold public office and make decisions affecting the safety and welfare of the community surrender some degree of privacy that common citizens enjoy. Lehrhaupt v. Flynn, 140 N.J. Super. 250, 262, 356 A.2d 35 (App. Div. 1976) ("By accepting public employment an individual steps from the category of a purely private citizen to that of a public citizen. And in that transition he must of necessity subordinate his private rights to the extent that they may compete or conflict with the superior right of the public to achieve honest and efficient government."), aff'd, 75 N.J. 459, 383 A.2d 428 (1978). After all, the public must have confidence that public officers are rendering decisions impartially **361 and free of any conflicts that may compromise their independence. See N.J.S.A. 40A:9-22.2(b) ; see also Thompson, 190 N.J. at 374, 921 A.2d 427.
Nevertheless, the nature of any disclosure relating to a patient-physician relationship must be weighed against the official's reasonable expectation of privacy. If the court determines that there is a meaningful patient-physician relationship, *200 then the nature of the disclosure will depend on, among other factors, the degree of need for access to the information, the damage excessive disclosure would cause to a patient's right to privacy, the adequacy of safeguards to prevent excessive disclosure, and the personal dignity rights of the official. See Doe v. Poritz, 142 N.J. 1, 88, 662 A.2d 367 (1995) (discussing the factors to be applied when determining whether the government must disclose information implicating a privacy interest); see also Burnett v. County of Bergen, 198 N.J. 408, 427, 968 A.2d 1151 (2009) (adopting the Doe factors for determinations of whether to disclose records sought under the Open Public Records Act).
Every reasonable precaution must be taken to protect against the unnecessary release of a patient's health-care information. Certain sensible approaches should be kept in mind. A zoning board member who recognizes the applicant as one with whom he or she has a meaningful patient-physician relationship can simply disqualify himself or herself from the case, with nothing more being said. One would expect, in most cases, a zoning board member to know whether that type of meaningful relationship exists, after some explanation by the zoning board attorney. If in doubt, the member can consult with the board attorney and speak in hypothetical terms to gain an understanding whether recusal is appropriate. Erring on the side of disqualification when the board member has had a patient-physician relationship with the applicant is the most prudent course.
The challenge will be in those cases where a board member, or the member's immediate family, has had a patient-physician relationship that the member may not consider meaningful, but where **362 an objector could conclude that the relationship is one that "might reasonably be expected to impair [the member's] objectivity or independence of judgment." See N.J.S.A. 40A:9-22.5(d). In such cases, the board member should not be required to disclose anything more than that he or she, or a family member, was at one time a patient of the applicant or objector or someone with a property interest at stake in the outcome of the proceedings. Then, if the issue is contested in an action in lieu of prerogative writs, any disclosures should be heard in camera and ex parte before a Law Division judge. Only if the judge concludes that disclosure is necessary should some form of disclosure be mandated, and then only to the extent reasonably necessary, minimizing the invasion of privacy into such sensitive matters. A board member should not be required to reveal the precise nature of a medical condition or other intimate details of treatment. Any potential disclosure must be balanced against the sanctity of the privacy of the patient's health information.
Because the trial court determined that any inquiry into a meaningful patient-physician relationship between a Board member and Dr. Kenneth, Dr. Daniel, or Dr. Daniel III was irrelevant, it struck interrogatories that, if answered, may have revealed such a relationship. We conclude that the trial court erred in barring any inquiry into the subject matter. Dr. Kenneth and Dr. Daniel had practiced medicine in Garfield for many decades. That one or both, or Dr. Daniel III, may have had a meaningful patient-physician relationship with a Board member or with the member's immediate family is not a far-fetched assumption.
Because the Appellate Division affirmed the Law Division judge, we remand to the trial court to explore this issue within the constraints set forth in this opinion.
*201 VI.
An impartial hearing before a zoning board is an essential promise of our laws. That promise cannot be fulfilled if those rendering decisions are impaired by conflicts of interest. For the **363 reasons expressed, we reverse the judgment of the Appellate Division and remand to the trial court for proceedings consistent with this opinion.
CHIEF JUSTICE RABNER and JUSTICES PATTERSON and TIMPONE join in JUSTICE ALBIN's opinion. JUSTICE SOLOMON filed an opinion dissenting in part, in which JUSTICES LaVECCHIA and FERNANDEZ-VINA join.

The facts adduced here come from the proceedings before the Zoning Board, the record developed in the action in lieu of prerogative writs in the Superior Court, and the appendices submitted to the Appellate Division and this Court.

The trust's initials -- DSJ -- correspond with the names Daniel, Stacey, and Jamie.

The initial land use development application stated that the applicant was the "Trust of Daniel P. Conte, III, Stacey A. Conte and Jamie G Kreshpane."

One month earlier, the addendum to the land use development application filed by the DSJ Family Trust's attorney listed Kenneth Conte as the trustee of the Dr. Daniel Trust.

Zoning Board member Cochrane did not vote on the application, although he was present and participated at the first three of the four meetings. An alternate Zoning Board member voted in his place on the last hearing date.

Our recitation of the issues before the trial court and Appellate Division is limited to those relevant to the appeal before this Court.

The Zoning Board's brief to this Court makes no distinction between Dr. Kenneth and his trust.

Notably, the City of Garfield has an independent ethics rule for members of its Zoning Board of Adjustment that largely tracks the language of the MLUL. It provides that
[n]o member of the Planning Board or Zoning Board of Adjustment shall act on any matter in which he has, either directly or indirectly, any personal or financial interest. Whenever any such member shall disqualify himself from acting on a particular matter, he shall not continue to sit with the Board on the hearing of such matter nor participate in any discussion or decision relating thereto.
[City of Garfield, N.J., Code ch. 188, art. III, § 188-25 (2018).]