**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3881-23

JEFFREY BOVA, CELESTE
BOVA, his wife, ARNOLD
LOMITA and PAULINE LOMITA,
his wife, and OMEGA FARM, LLC,

     Plaintiffs-Appellants,

v.

TOWNSHIP OF JACKSON
PLANNING BOARD and BAIS
YAAKOV OF JACKSON, INC.,

     Defendants-Respondents.

_____

Argued October 29, 2025 – Decided February 4, 2026

Before Judges Currier, Smith and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-1727-23.

Joseph Michelini argued the cause for appellants (O'Malley, Surman & Michelini, attorneys; Joseph Michelini, on the briefs).

Robert C. Shea, II argued the cause for respondent Township of Jackson Planning Board (R.C. Shea & Associates, attorneys; Robert C. Shea, II, on the brief).

Donna M. Jennings argued the cause for respondent Bais Yaakov of Jackson, Inc. (Wilentz, Goldman & Spitzer, PA, attorneys; Donna M. Jennings, of counsel and on the brief; Anthony J. Zarillo III, on the brief).

PER CURIAM

In this matter, plaintiffs, as nearby property owners, challenged the Jackson Township Planning Board's (Board) approval of a major site plan for the construction of a private school campus. Plaintiffs alleged there were undisclosed conflicts between a Board member and counsel, erroneous statements in the Environmental Impact Statement (EIS), error in the Board's handling of endangered species habitat, site access and parking waivers, and lack of procedural fairness. The trial court rejected these claims and dismissed the complaint. We affirm.

I.

In October 2022, defendant Bais Yaakov of Jackson, Inc. (BYJ) applied to the Board for preliminary and final major site plan approval to construct a four-building, private all-girls religious school campus in the Township of Jackson (Township). The proposal consisted of an elementary school, two high schools, and a gymnasium, for a total capacity of approximately 2,350 students

and 250 staff members on 37.9 acres. The proposed layout included two new driveways connecting to East Veterans Highway, one full-access, signalized driveway, and one right-in/right-out driveway. The plans included new parking areas, landscaping, stormwater management basins, and internal vehicular and pedestrian circulation improvements.

Ian M. Borden, P.P., prepared the EIS for the project. The EIS concluded that all major environmental concerns, including wildlife habitat, were addressed or avoided with no expected significant impacts. The only unavoidable impact noted was the removal of twelve acres of forest. The report found the project complied with zoning and all relevant environmental regulations.

John H. Rea, P.E., submitted a Traffic Impact Analysis to the Board as part of the site plan application. His study included field visits, manual and automated traffic counts during peak school hours, and projected traffic volumes to the year 2032, accounting for general growth and nearby development. Operating assumptions included that almost all students would arrive by bus, with only seven to ten percent dropped off by parents, and no student drivers permitted. These factors were used to estimate site-generated traffic.

A-3881-23

Rea's analysis found that, with the planned improvements, including a traffic signal and appropriate turn lanes at the main entrance, the site would operate at acceptable traffic levels at all critical intersections, both on-site and nearby, for the design year. He concluded that the new campus would not generate unacceptable impacts on the public roadways, taking into account future traffic in the area. Rea also recommended traffic control infrastructure improvements and the implementation of busing operations.

BYJ's application was submitted to the Township's Environmental Commission (EC) and on November 22, 2022, the EC wrote to the Board, stating: "The E[C] has reviewed the plans listed above. There are no immediate environmental concerns with the application."

Ernest J. Peters Jr., P.E., P.P., C.M.E., a licensed professional engineer and planner who served as the Township planner, reviewed BYJ's site plan proposal and issued a planning review letter. His role was to evaluate the application for conformance with the Township's zoning and planning regulations, identify areas of concern, and provide recommendations or questions for the Board's consideration.

In his letter, Peters reviewed the zoning for the area and found the proposal did not comply with several key standards: the minimum required lot

width (the project proposes about 130 feet where 200 feet are required), the building height for at least one building (thirty-six feet proposed versus thirty-five feet maximum),[1] and the minimum required on-site parking for both the elementary and high schools, although BYJ's application proposed significant parking shortfalls to be made up with "land banked" spaces if later needed. Peters noted that these deficiencies would require the Board to consider granting variances or design waivers, depending on the facts and justifications presented by BYJ.

Peters raised environmental concerns about the use of an on-site septic system and included questions about traffic circulation, adequacy of parking, site layout, Americans with Disabilities Act access, landscaping, lighting, stormwater, and trash management. He requested that BYJ address each of these points in detail during further testimony and submissions.

Douglas F. Klee, P.E., P.P., C.M.E., Board Engineer for the Township, reviewed the BYJ application and submitted a letter to the Board regarding the need for variances concerning the zoning requirements, as also noted by Peters. He also identified a significant on-site parking shortfall for the elementary and

---

[1] During the hearing, BYJ's engineer advised there was a typographical error on the architectural plans and the building heights would comply with the zoning ordinance.

A-3881-23

high schools, with "land banked" future spaces proposed and requiring justification. Klee expressed concern about the use of a large on-site septic system, which is atypical for schools, and flagged the need for testimony on its environmental impact, especially regarding local wells and any required New Jersey Department of Environmental Protection (DEP) permitting. Additional comments focused on traffic and access safety, site grading and stormwater management, landscaping and lighting, adequacy of trash handling, and architectural compliance. He noted that many plans and technical documents were incomplete or needed revision, and that multiple outside agency approvals would be required. Klee recommended that only preliminary site plan approval be considered until all zoning, design, environmental, and permit issues were fully resolved through additional testimony and plan revisions.

The Board held public hearings on February 21 and March 20, 2023, to review BYJ's application. Plaintiffs, who own properties adjacent to the project, objected to the application. Their concerns included the impact on neighborhood character, density, increased traffic, the environment, and adequacy of the proposed septic and stormwater systems.

BYJ representative Rabbi Aharon Rottenberg, a board member and volunteer of the Lakewood Cheder School, testified about the proposed new

6

school's operations, student and staff numbers, busing, parking, building maintenance, food service, and hours and sessions of operation.

William A. Stevens, P.E., P.P., BYJ's engineer and planner, presented the overall vision and technical details of the proposed private school. Stevens highlighted the circulation plan, noting that each school would have separate lanes for buses and parent drop-offs, as well as safe pedestrian access with sidewalks and crosswalks. He acknowledged the project sought "land banking" for 136 of the required parking spaces, meaning these would be used initially as a green play area, available for conversion to parking if future needs demanded it.

Addressing the Board's concerns, Stevens explained that the project would comply with all stormwater and environmental requirements, and that public water, but not public sewer would be available, necessitating a state-licensed large septic system. He stated the buildings would meet height and lot width requirements once the lots were consolidated and the plans revised. Stevens also described the placement of refuse enclosures, site lighting, and proposed fencing around stormwater and play areas for safety.

A-3881-23

The hearing continued on March 20, 2023, during which BYJ's experts Rea, Borden, and architect Melissa Mermelstein, RA, testified. Rea reiterated the traffic analyses set forth in his report.

During Borden's testimony regarding the EIS, plaintiffs' counsel questioned the EIS's designation of a particular area as rank three rather than rank four when considering the presence of endangered/threatened species. The referenced portion of the site was in the rear of the property, within the undisturbed wetland buffer.

The rankings refer to a map found on DEP's website which uses documented species location data, land-use and land-cover information, and species life history data to produce habitat maps across the state and assigns "ranks" for conservation. Rank five is the highest rank which refers to a habitat with state and/or federally listed endangered and threatened species. The lower ranks indicate urban areas with less concern. Borden responded that, even if the proposed site had been ranked erroneously, it did not matter because the designated portion was not being developed. The EIS and Borden concluded there were no endangered or threatened species present outside the undisturbed buffer areas.

Mermelstein testified about the design of the proposed campus. She described the building layouts and materials and confirmed that the building heights would comply with the thirty-five-foot maximum after plan corrections.

The Board approved the application on March 20, 2023, memorializing it in a resolution on June 19, 2023. The Board granted approval subject to BYJ's compliance with all terms and conditions in the resolution. The Board found that BYJ's requests for variances and waivers at the proposed site would not substantially harm the public good or intent of the zoning ordinance, and the benefits outweighed any detriments, as required by N.J.S.A. 40:55D-70(c).

II.

In July 2023, plaintiffs filed an amended complaint in lieu of prerogative writs, challenging the Board's approval of BYJ's application. They alleged the Board acted arbitrarily and capriciously by granting variances and design waivers without sufficient factual or legal justification. Plaintiffs further asserted the Board's decision was procedurally and substantively deficient, failed to address expert concerns, and was tainted by conflicts of interest and due process violations during the public hearing process.

In November 2023, plaintiffs filed a motion to enlarge the record and for discovery. Plaintiffs alleged that BYJ's counsel and Board Chairman Tsvi

Herman had an attorney-client relationship during the hearings in this matter because counsel represented Herman's synagogue in an application before the Township Zoning Board. Plaintiffs submitted: (1) three emails from BYJ's counsel to the Township Zoning Board confirming her representation of Bais Medrash of Jackson, Inc. (BMOJ); (2) an article in the online magazine—Jackson Pulse—written by Herman as its editor in March 2023, commending Jackson for approving the construction of an orthodox school; (3) an article from October 2021 discussing "[p]lans for the first authorized Orthodox Jewish synagogue in Jackson;" (4) a deed reflecting Herman's ownership of property in the Township; and (5) a notice from the Township Zoning Board of Adjustment listing BYJ's counsel as the attorney for BMOJ.

On January 5, 2024, the trial court denied the motion to supplement the record and to conduct discovery. The court found the attorney representing BYJ in this application before the Board also represented an alleged interested party before a separate board—the Township Zoning Board. Herman was not a member of the zoning board. The court noted that in the zoning board case, counsel represented the applicant—BMOJ, not Herman. The court found any connection was too tenuous and remote to find a conflict in this matter. The

court stated "there's no basis to expand the record, and the . . . documents . . . ha[d] no relevance" to the BYJ application.

On June 6, 2024, the court issued a comprehensive oral decision finding the Board's decision approving BYJ's application was not arbitrary or capricious. In a June 28, 2024 memorializing order, the court dismissed the complaint with prejudice.

III.

On appeal, plaintiffs reiterate their arguments made before the trial court and contend the court erred in dismissing their complaint.

"When reviewing a trial court's decision regarding the validity of a local board's determination," appellate courts "are bound by the same standards as was the trial court." Jacoby v. Zoning Bd. of Adj. of Borough of Englewood Cliffs, 442 N.J. Super. 450, 462 (App. Div. 2015) (quoting Fallone Props., LLC v. Bethlehem Twp. Plan. Bd., 369 N.J. Super. 552, 562 (App. Div. 2004)). We "give deference to the actions and factual findings of local boards and may not disturb such findings unless they were arbitrary, capricious, or unreasonable." Ibid.

The trial court addressed each of plaintiffs' assertions regarding the Board's conclusions and found them to be without merit. After careful review,

11

we discern no reason to disturb the court's order dismissing plaintiffs' complaint. We need only briefly discuss some of the issues.

A.

Plaintiffs assert the Board, and in turn the court, erred in disregarding the testimony that the EIS mistakenly stated the property was rank three regarding endangered or threatened species habitat on the property.

In the EIS, Borden stated that the rear portion of the site, within the undisturbed riparian and wetland buffer, was mapped as rank three on the project, and asserted that "[t]here is no mapped threatened or endangered species habitat on or within close proximity to the site." During cross-examination, plaintiffs' counsel presented the DEP map showing that some of the areas within the designated project site were mapped as rank four, contradicting Borden's EIS.

Borden agreed that the map which showed that portion of the property as rank four (habitat for species identified by the State as endangered), was different from the EIS's determination of rank three (habitat for species identified as threatened). However, Borden explained that identifying the area as rank four instead of rank three did not make a difference "[b]ecause [the ranked area] . . . would be in the portion of the site that we're not developing."

12

In addressing this issue, the court stated:

> [BYJ] provided the testimony of an environmental expert. Although plaintiff[s] argue[] that . . . Bova's lay opinion testimony as to his opinion[2] with regard to the presence of endangered species based on the review of the printed out geo map was credible and sufficient to rebut the testimony of their expert, Borden, the [B]oard was free to disregard that testimony in the face of the [EC's] recommendation and . . . [BYJ's] expert testimony.
>
> Further, it was reasonable for the [B]oard to disregard plaintiffs' reference to the N.J. GeoWeb Map where . . . plaintiff[s] produced no expert to introduce and explain the map and . . . how it . . . conflicted with the expert report and the EIS.

Borden provided the only expert evidence on this issue, informing the Board that the ranking made no difference as the area lay outside the intended development site of the project. Borden also stated that he did not believe the Board had authority to reject an application based on wildlife habitat disturbance, testifying that "is firmly in the DEP['s] [jurisdiction]." The court did not err in finding it was reasonable for the Board to disregard the harmless error in the EIS.

---

[2] The court misspoke here. As stated, it was plaintiffs' counsel who presented the DEP map during his cross-examination of Borden. This harmless error did not affect the court's analysis.

Moreover, BYJ complied with Jackson, N.J. Code § 244-189, which requires applicants for major site plans to submit an EIS prepared by qualified professionals, detailing the project's environmental effects and proposed mitigation measures. The Code provides that "[t]he [EIS] . . . shall be submitted to the [EC] for its review and recommendation."

Borden prepared the EIS for BYJ's application, and it was submitted to the EC. The EC reviewed it and found no concerns. The trial court stated:

> [T]he record shows that BYJ submitted an EIS, which was reviewed by the town's [EC], which operates in an advisory role pursuant to township ordinances, where the commission found that there [were] no immediate concerns. . . . and recommended the application.

Thus, BYJ and the Board complied with the procedural requirements for submitting the EIS.

Furthermore, the Resolution conditioned approval of BYJ's application upon subsequent approval from other governmental agencies:

> **BE IT FURTHER RESOLVED,** that this approval is further conditioned on the agreed upon terms set forth within this document as well as the following:
>
> 1. The receipt by the Applicant of all approvals and compliance with all permit conditions from any Federal, State, County or local regulatory agency having jurisdiction over this Application. Upon receipt of such approvals, the Applicant shall provide a copy of any permit or written evidence of approval to the

14

Board and its professional staff. IF any agency requires a change in the plans approved by the Board, the Applicant must reapply to the Board for approval of that change.

Therefore, the Board's decision was not arbitrary and capricious. The court did not err in declining to overturn the Board's decision on this issue.

## B.

After reviewing plaintiffs' arguments regarding Board error in: (1) granting BYJ's proposal regarding two-way entrances to the school; (2) not requiring a variance for the lot width; and (3) not according counsel sufficient time to cross-examine certain witnesses, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

## C.

We briefly address plaintiffs' argument that the court erred in denying their motion to supplement the record regarding the alleged conflict of interest between BYJ's counsel and Board Chairman Herman.

After the complaint in lieu of prerogative writs was filed and six months after the Board concluded its hearings, plaintiffs' counsel moved to supplement the record and for discovery. Plaintiffs presented evidence that (1) counsel for BYJ was representing another entity—BMOJ—on an application before the Township Zoning Board, (2) Herman had written an article for an online

magazine after the BYJ application was approved, and (3) Herman owned property in Jackson. Plaintiffs' counsel believed Herman was a congregant of BMOJ, which created a conflict of interest for him, requiring his disqualification from the Board proceedings on this application. BYJ's counsel represented to the court during oral argument on the motion that her client before the zoning board was BMOJ, and she had no interaction with Herman.

"The overall objective 'of conflict of interest laws is to ensure that public officials provide disinterested service to their communities' and to 'promote confidence in the integrity of governmental operations.'" Piscitelli v. City of Garfield Zoning Bd. of Adjustment, 237 N.J. 333, 349 (2019) (quoting Thompson v. City of Atl. City, 190 N.J. 359, 364 (2007)). An analysis of whether a conflict of interest prevented Herman from participating in the consideration of BYJ's application is governed by the Local Government Ethics Law (LGEL), N.J.S.A. 40A:9-22.1 to -22.25, and the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -171. Piscitelli, 237 N.J. at 349-50.

"The [LGEL] applies to all municipal office holders, including . . . members of planning boards and zoning boards of adjustment." Id. at 350; see also N.J.S.A. 40A:9-22.3(g). N.J.S.A. 40A:9-22.5(d) provides that:

> [n]o local government officer or employee shall act in
> his official capacity in any matter where he, a member

16

of his immediate family, or a business organization in which he has an interest, has a direct or indirect financial or personal involvement that might reasonably be expected to impair his objectivity or independence of judgment.

Similarly, the MLUL provides that no member of a municipal planning board "shall be permitted to act on any matter in which he has, either directly or indirectly, any personal or financial interest." N.J.S.A. 40:55D-23(b); Grabowsky v. Twp. of Montclair, 221 N.J. 536, 552 (2015).

A court must determine "whether the circumstances could reasonably be interpreted to show that [conflicting interests] had the likely capacity to tempt the official to depart from his sworn public duty." Piscatelli, 237 N.J. at 353 (alteration in original) (quoting Wyzykowski v. Rizas, 132 N.J. 509, 523 (1993)).

However, courts should apply the conflict-of-interest rules cautiously, as "[l]ocal governments would be seriously handicapped if every possible interest, no matter how remote and speculative, would serve as a disqualification of an official." Grabowsky, 221 N.J. at 554 (alteration in original) (quoting Wyzykowski, 132 N.J. at 523). Indeed, public officials "cannot and should not be expected to be without any personal interest in the decisions and policies of government." N.J.S.A. 40A:9-22.4. Accordingly, "the nature of an official's

interest must be carefully evaluated based on the circumstances of the specific case." Grabowsky, 221 N.J. at 554 (citing Van Itallie v. Borough of Franklin Lakes, 28 N.J. 258, 268 (1958)).

Here, the court correctly determined that plaintiffs' allegations did not establish a claim of either an actual conflict or a potential conflict. Plaintiffs presented evidence that Herman was on the BMOJ board. BMOJ was presenting an application to the Township Zoning Board to construct a schul. Herman was not a member of the zoning board. He had no input or influence regarding the BMOJ application. Plaintiffs did not present evidence of a common interest, coordination, or direct involvement between Herman and BYJ or their mutual counsel. As the court found, it was "far too remote" a connection for the court to find a conflict. The court also determined that the comments in the Jackson Pulse magazine did not form any basis for a conflict. We are satisfied the trial court properly exercised its discretion in denying discovery and to supplement the record, and ultimately dismissing plaintiffs' complaint with prejudice.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division